**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROGER L. LINDEY,<br>Plaintiff,<br>v.<br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,[1]<br>Defendant. | ) | Civil Action No. 06-146 Erie |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

Plaintiff, Roger Lindey, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq,* and § 1381 *et seq.* Lindey filed applications for DIB and SSI in February 2004 alleging disability since November 15, 2003 due to fibromyalgia, manic depression and an inability to read or write (Administrative Record, hereinafter "AR", 69-71; 85; 254-255). His applications were denied, and he requested a hearing before an administrative law judge ("ALJ") (AR 54-58; 60; 257-261). A hearing was held before an administrative law judge ("ALJ") on October 31, 2005 (AR 26-51). Following this hearing, the ALJ found that Lindey was not entitled to a period of disability, DIB or SSI under the Act (AR 15-23). His request for review by the Appeals Council was denied (AR 5-8), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will deny both motions.

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. 405(g), he is automatically substituted as the defendant in this case.

## I. BACKGROUND[2]

Lindey was born on May 6, 1969 and was thirty-six years old on the date of the ALJ's decision (AR 69). He has a ninth grade education and previously worked as a cook, dishwasher and kitchen helper (AR 32; 48). The medical evidence before the ALJ relative to Lindey's alleged mental impairments consisted of the following:[3]

Lindey was evaluated by Lamar Neal, Psy.D., on April 12, 2004 pursuant to the request of the Commissioner (AR 118-130). Dr. Neal reported that Lindey's grooming and hygiene were adequate and casual, he was pleasant and established rapport (AR 118). Lindey reported a history of alcohol abuse and frequent blackouts (AR 119). He admitted to drinking on a limited basis but denied becoming intoxicated (AR 120). He reported that the previous evening he had two beers and admitted to smoking marijuana approximately one month earlier (AR 120). Lindey denied ever having any impatient psychiatric care, but had undergone court-ordered treatment for anger management (AR 119). He reportedly had been seen by a psychiatrist while incarcerated due to problems stemming from a protection from abuse order, who diagnosed him as bipolar with anxiety disorder (AR 119). He was placed on medication at that time but discontinued his medication when released from incarceration (AR 119). Lindey indicated that he felt he was managing his anger symptoms adequately, but acknowledged recent outbursts and physical altercations (AR 119).

Lindey stated his longest full time job was as a cook at a restaurant, but he quit due to increasing stress and pain (AR 121). He indicated he became angry with the manager and "walked out" (AR 121). He reportedly quit a part-time cook job at another restaurant due to a lack of hours and problems with the owner's son (AR 121). He described a history of conflict with others but denied being fired from jobs (AR 121). Dr. Neal noted that he had a significant

---

[2]Lindey does not challenge the ALJ's assessment of the evidence relating to his alleged physical impairments. *Plaintiff's Brief* p. 2. Accordingly, our factual recitation and discussion will focus exclusively on the evidence relative to his alleged mental impairments.

[3]Both parties in their Briefs before this Court cite to medical evidence which was submitted to the Appeals Council but not considered by the ALJ in rendering his decision. Pursuant to *Matthews v. Apfel,* 239 F.3d 589, 593 (3rd Cir. 2001), we cannot consider this evidence in our substantial evidence review of the ALJ's decision.

legal history, with multiple charges as a teenager for truancy, charges as an adult for disorderly conduct, public intoxication, disturbing the peace, and threats against his ex-wife (AR 121). Lindey reported being in and out of jail over a six month period due to violations of a PFA and was on parole until 1997, but denied any current legal problems (AR 121).

Lindey reported that he lived in an apartment with his mother and sister and was independent with most activities of daily living (AR 121). He was able to do his own laundry, cook and manage his finances, and had previously managed his own bank account (AR 121). He previously was able to manage outside chores when he lived in a home (AR 121). He reported few friends but enjoyed spending time with his family (AR 121).

On mental status examination, Dr. Neal reported that he was friendly, pleasant and quite social (AR 122). His speech was fluent and his responses to questions were appropriate (AR 122). Dr. Neal administered IQ testing, and the results placed Lindey in the borderline range of intelligence (AR 122). Lindey complained of a depressed mood, impaired sleep, being easily irritable and stress due to financial problems and lack of work (AR 123). He admitted passive suicidal ideation with no active intent (AR 123). He described a frequent altercation with a neighbor (AR 123). Dr. Neal noted that Lindey appeared to have low frustration tolerance and limited coping resources (AR 123).

Dr. Neal diagnosed Lindey with bipolar disorder NOS; reading disorder; and cannabis abuse, rule out alcohol abuse, and assigned him a Global Assessment of Functioning ("GAF"), score of 60 (AR 123).[4] He noted Lindey appeared to be impulsive with extremely low frustration tolerance and had extremely limited insight into the nature of his difficulties (AR 123). Dr. Neal further noted that he appeared to have difficulty with supervisory relationships, as well as relationships with co-workers (AR 124). He found Lindey under a moderately significant degree of stress and indicated that he did not appear to be able to tolerate current stressors (AR 124).

---

[4]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

However, he found his prognosis for positive change was good if Lindey was amenable and compliant with psychiatric treatment (AR 124).

Dr. Neal concluded that Lindey had no limitations in his ability to understand, remember and carry out short, simple instructions and was slightly limited in his ability to interact with the public. He further observed that he was moderately limited in his ability to understand, remember and carry out detailed instructions; make judgments on simple work-related decisions; and respond appropriately to changes in a routine work setting. Finally, he concluded that he was markedly limited in his ability to interact appropriately with supervisors and co-workers, and respond appropriately to work pressures in the usual work setting (AR 129).

On April 20, 2004, a state agency reviewing psychologist opined that Lindey had the mental residual functional capacity to perform simple, routine, repetitive work in a stable environment; carry out short and simple instructions; maintain socially appropriate behavior; perform personal care functions needed to maintain an acceptable level of personal hygiene; and perform production oriented jobs requiring little independent decision making (AR 146). The state agency psychologist considered Dr. Neal's assessment and noted that it appeared he relied heavily on the subjective report of symptoms and limitations provided by Lindey; however, the psychologist concluded that the totality of the evidence did not support his subjective complaints (AR 146). He concluded that Lindey was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments (AR 147).

Lindey began treatment at Stairways Behavioral Health Outpatient Clinic in June 2004 and was psychiatrically evaluated Helen Kohn, M.D. (AR 242-245). He reportedly was depressed, had suicidal ideas and felt paranoid, like people were watching him (AR 242). He stated that little things would "tick him off" (AR 242). On mental status examination, Dr. Kohn reported that he was cooperative, alert and appropriately dressed with adequate hygiene (AR 244). His speech was spontaneous and his thought processes were fairly organized with no loose associations or thought blocking (AR 244). Dr. Kohn reported that during the interview Lindey's affect was fairly cheerful, however, after the interview he showed very impaired impulse control with his anger, engaging in a "tantrum and tirade" in the waiting room (AR 244). She diagnosed him with bipolar affective disorder, type II, depressed type; alcohol dependence in early partial

remission; and borderline personality disorder (AR 244). She assigned him a GAF score of 50 (AR 244).[5] Dr. Kohn increased his Effexor dosage and referred him to the anger management group (AR 245).

On June 14, 2004, Lindey appeared at the clinic complaining of auditory and visual hallucinations (AR 249). The following day Dr. Kohn changed Lindey's medication from Effexor to Lexapro (AR 250).

On September 13, 2004, Lindey requested that Dr. Kohn complete an unemployability form (AR 250). Dr. Kohn informed him that she would complete the form for no greater than three months (AR 250). On mental status examination, Dr. Kohn reported that Lindey's affect was pleasant, his mood was dysphoric, he denied suicidal ideations and had no symptoms of psychosis (AR 250). She discontinued Trazadone and continued him on Lexapro (AR 250).

Progress notes dated October 1, 2004 showed that Lindey continued to complain of mood swings and anger problems; however, it was noted that he failed to attend the anger management group (AR 246). He was encouraged to maintain consistent attendance at all scheduled appointments (AR 246). On October 6, 2004 Lindey called and complained of sleep problems, stating he had not slept for four days straight and was irritable (AR 250). He called the clinic on two other occasions in October 2004 complaining that he was unable to sleep and that his medication was not working (AR 244).

On December 14, 2004, Lindey called the clinic requesting that he be assigned another physician since his current physician would not continue to sign his DPW paperwork (AR 244). He reported that he was self-medicating with two to three times the appropriate dose of his medication (AR 244). He was told to take his medication as prescribed by his doctor (AR 244). He declined to speak with a nurse, and was told that if he required assistance after hours to call crisis intervention or report to the emergency room (AR 244). Lindey denied any suicidal or homicidal ideations (AR 244).

On December 20, 2004, progress notes indicated that Lindey was informed that he should

[5]Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

keep his follow-up appointment with Dr. Kohn and discuss a physician change at that time (AR 240).

Lindey was seen by a nurse practitioner on December 22, 2004 and reported sleep and anger problems (AR 240). The nurse practitioner noted that he was having mood swings and had reported stressors at home (AR 240). Different medications were discussed, and Lindey reported that he had taken Depakote while incarcerated and it "seemed to work" for him (AR 240). On December 28, 2004 he was started on Seraquel (AR 240).

Lindey was seen by Sean Su, M.D., at Stairways on March 31, 2005 and complained of mood swings, depression, anxiety, irritability and insomnia (AR 235). He denied suicidal or homicidal ideations (AR 235). Lindey reported that he had done better in the past on Depakote, and Dr. Su added Depakote for mood instability (AR 235). Dr. Su also increased his Lexapro dosage for his depression (AR 235).

On May 3, 2005, Lindey complained of insomnia and daytime fatigue and his medications were adjusted (AR 234). On May 5, 2005 Lindey indicated that he had not taken Risperdal as prescribed since he was concerned about possible side effects (AR 234). Dr. Su noted that while he reportedly still had mood swings, they were less than before (AR 234). His affect was reported as anxious, labile at times (AR 234).

When seen by Dr. Su on July 11, 2005, Lindey complained of mood swings, anxiety, feeling upset and frustrated about his chronic pain secondary to his physical condition (AR 234). He denied any suicidal or homicidal ideations, and Dr. Su reported that his affect was labile and dysphoric (AR 234). His medications were adjusted (AR 234).

On August 17, 2005, Lindey reported mood swings and of "hearing voices" in his head, but denied suicidal or homicidal ideations (AR 231). Lindey claimed his sister was upset with him because he had been isolative and was not helping with housework (AR 231). He further complained of drowsiness from his medications (AR 231). Dr. Su adjusted his medications (AR 231).

Lindey reported on October 5, 2005 that he took himself off one of his medications because it made him sleep excessively (AR 230). He claimed he was extremely paranoid, was hearing voices in his head and was "afraid to sleep" (AR 230). Dr. Su reported his affect was

labile, irritable and anxious, but he denied any suicidal or homicidal ideations (AR 230). Dr. Su diagnosed bipolar disorder with psychosis, rule out schizoaffective disorder, borderline personality disorder, and history of alcohol dependence (AR 231). Dr. Su increased his medication dosages due to his psychotic symptoms (AR 230).

Finally, on November 3, 2005, Dr. Su completed a form entitled "Mental Abilities and Aptitudes Needed to do Unskilled Work" (AR 253). Out of the nine abilities listed on the form, Dr. Su circled eight statements indicating that Lindey would not be able to perform on a regular and continuing basis (AR 253). Specifically, Dr. Su found Lindey would not be able to maintain attention for extended periods; maintain regular attendance and be punctual with customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes (AR 253). Dr. Su checked "yes" when asked if his opinions were based upon "mental status examinations, observation of patient, clinical history, and/or review of symptoms and signs" (AR 253).

Lindey and William Reed, a vocational expert, testified at the hearing held by the ALJ (AR 26-51). Lindey testified that he lived with his disabled sister (AR 33). He further testified that he had difficulty reading and did not know how to drive (AR 34). He claimed he stopped working because he was uncomfortable working around others (AR 35). Lindey testified that he quit his last job because they accused him of stealing and due to frustration (AR 43). He also had problems getting along with his supervisors and did not respond well to criticism (AR 44). Lindey admitted previous marijuana and alcohol usage and stated that he "smoke[d] a joint not too long ago," but claimed he no longer drank (AR 36-37). He testified that he was previously incarcerated for a PFA violation in 1997 (AR 37). He indicated that he was treated by Dr. Su for his mental condition, but did not know if Dr. Su had imposed any limitations (AR 38). His medication regime at the time of the hearing consisted of Abilify, Depakote, Risperdal and

Lexapro (AR 39).

Lindey testified that he "sometimes" cooked meals for himself, but indicated that his sister cooked for him most of the time and did the shopping (AR 39-40). He used a computer "once in a while," occasionally watched football and movies on television and listened to music (40-42). Lindey indicated he was able to get along with his family and neighbors "somewhat" and was able to get along with his friends (AR 42). He had more bad days than good and avoided people (AR 46). He testified that every time he walked down the street people looked at him and he would "always" see them laugh (AR 46).

The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as Lindey, who could perform simple, routine, repetitive work in a stable environment, carry out very short and simple instructions, maintain socially appropriate behavior, perform personal care functions to maintain an acceptable level of personal hygiene and perform production oriented jobs requiring little independent decision making (AR 48-49). The expert opined that such an individual could perform his past relevant work as a dishwasher (AR 49).

Following the hearing, the ALJ issued a written decision which found that Lindey was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 15-23). His request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 5-8). He subsequently filed this action.

## II. Standard of Review

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. Discussion

Title II of the Social Security Act provides for the payment of disability insurance

benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Lindey met the disability insured status requirements of the Act (AR 15). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ determined that Lindey's bipolar disorder and personality disorder were severe impairments, but determined at step three that he did not meet a listing (AR 17-19). Despite his impairments, the ALJ found that he was able to perform simple, routine, repetitive work in a stable environment, carry out short and simple instructions, maintain socially appropriate behavior, perform personal care functions to maintain an acceptable level of personal

hygiene and perform production oriented jobs requiring little independent decision making (AR 19). The ALJ concluded that he could perform his past relevant work as a dishwasher (AR 22). The ALJ also concluded that Lindey was not fully credible (AR 20). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Although Lindey sets forth a number of errors allegedly committed by the ALJ, he argues, in essence, that the ALJ erred in his evaluation of the medical evidence and in his credibility determination.

Lindey first argues that the ALJ failed to give controlling weight to the opinion of Dr. Su, his treating physician, and/or rejected his opinion on inadequate grounds in violation of the treating physician rule. The Third Circuit has repeatedly noted that "a cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel,* 225 F.3d 310, 317 (3rd Cir. 2000). *See also Plummer v. Apfel,* 186 F.3d 422, 429 (3rd Cir. 1999) (citing *Rocco v. Heckler,* 826 F.2d 1348, 1350 (3rd Cir. 1987); 20 C.F.R. § 404.1527(d)(2) (providing for controlling weight where treating physician's opinion is well-supported by medical evidence and not inconsistent with the other substantial evidence in the record). When medical testimony conflicts or is inconsistent, the ALJ is required to choose between them. *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981). In making that choice, a treating physician's conclusions are to be examined carefully and accorded more weight than a non-treating physician's opinion. *Podedworny v. Harris*, 745 F.2d 210, 217 (3rd Cir 1984). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so. *Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

As previously indicated, Dr. Su's opinion dated November 3, 2005 essentially precluded

Lindey from working. In according Dr. Su's opinion "limited weight," the ALJ relied upon the evaluations of Dr. Neal and Dr. Kohn. He observed that Dr. Neal had assigned Lindey a GAF score of 60, which was reflective of moderate limitations, and that the narrative portion of his report indicated that Lindey could perform simple to moderately complex instructions, but, given his history, would have difficulty interacting with supervisors and co-workers or tolerating current stressors (AR 21). The ALJ further observed that Dr. Kohn had assigned Lindey a GAF score of 50, which was reflective of serious symptoms, but had only recommended medications and counseling and not hospitalization (AR 21). Finally, the ALJ noted that treatment notes from Stairways documented counseling and medication adjustments (AR 21). He concluded:

> After reviewing these reports of treating and consulting examiners, and considering actual treatment notes in Exhibit 10F, the undersigned determined that the November 3, 2005 assessment of Dr. Su warrants limited weight because the extent of the functional limitations reflected in that assessment are not consistent with treatment notes which indicate that the claimant's psychiatric impairments are treated with counseling and medications and have not warranted emergency room treatment or hospitalizations.

(AR 21).

In this case, we find that the ALJ failed to address all the evidence in the record and/or adequately explain his rejection of the evidence which arguably supported Lindey's claim. While the ALJ's decision reflects that he reviewed the Stairways treatment notes, there is no explanation from the ALJ supportive of the conclusion that Dr. Su's assessment is not consistent with the treatment notes. Our review of the treatment notes reveal that there is arguably clinical support in the record which supports Dr. Su's opinion. For example, immediately following his initial evaluation by Dr. Kohn, she reported that he showed "very impaired impulse control" with his anger, engaging in a "tantrum and tirade" in the waiting room (AR 244). She assigned him a GAF score of 50 (AR 244), which reflects "serious symptoms." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000). In addition, Lindey consistently complained of depression, anxiety, irritability and mood swings, and Dr. Su on several occasions found his affect was anxious, labile, dysphoric, irritable and/or anxious (AR 230; 234). Dr.

Kohn's report and Dr. Su's treatment notes describe abnormalities in behavior, mood and thought, all of which are listed as examples of psychiatric signs in the Commissioner's regulations, *see* 20 C.F.R. §§ 404.1528(b); 416.928(b), and therefore, could constitute objective evidence supporting Dr. Su's assessment.

Similarly, the ALJ was somewhat selective in his utilization of Dr. Neal's assessment. For example, he relied on Dr. Neal's GAF score of 60, and his narrative that Lindey could perform simple to moderately complex instructions (AR 21). However, he completely ignored without adequate explanation Dr. Neal's opinion that Lindey would be markedly limited in his ability to interact appropriately with supervisors and co-workers, and respond appropriately to work pressures in the usual work setting (AR 129). Pursuant to the Commissioner's regulations, "marked" means more than moderate but less than extreme. 20 C.F.R. Subpt. P, App. 1, § 12.00 C.

We recognize that an ALJ may properly accept some parts of the medical evidence and reject other parts. *Adorno v. Shalala,* 40 F.3d 43, 48 (3rd Cir. 1994). However, if the ALJ opts not to credit certain pieces of evidence, it is critical that he acknowledge the evidence and explain his reasoning. We are of the opinion that the evidence highlighted above is sufficiently material to require the ALJ to adequately explain his apparent rejection of it on remand. *Cotter,* 624 F.2d at 705 (ALJ must properly provide some explanation for the rejection of probative evidence that would suggest a contrary result).

Lindey further challenges the ALJ's reliance on the state agency reviewing psychologist's opinion in fashioning his residual functional capacity ("RFC").[6] The state agency reviewing

---

[6] "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112, 121 (3rd Cir. 2000), quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2). An ALJ must consider all relevant evidence when determining an individual's residual functional capacity. *See* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3); *Burnett,* 220 F.3d at 121.

psychologist opined that Lindey was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments (AR 147). The ALJ accorded his opinion "great weight" since he found it was "consistent" with the actual treatment notes and the objective findings of Drs. Neal and Kohn (AR 21). He concluded that this evidence, coupled with Lindey's admitted daily activities and functional capabilities, persuasively established he had only a mild restriction in his activities of daily living, and no more than moderate difficulties maintaining social functioning, concentration, persistence or pace (AR 21).

The ALJ's reliance on the state agency reviewing psychologist's opinion also suffers from the same infirmities as his rejection of Dr. Su's opinion. As discussed above, the ALJ did not acknowledge and/or explain his apparent rejection of arguably relevant evidence supporting Lindey's claim. This conclusion extends to the ALJ's findings regarding Lindey's RFC. *Burnett v. Apfel,* 220 F.3d 112 (3rd Cir. 2000) (where the ALJ fails to assess all of the medical evidence, the ALJ's finding regarding the claimant's RFC is unsupported by substantial evidence).

Finally, Lindey challenges the ALJ's credibility determination. Since we have determined that remand is appropriate for the reasons discussed above, we need not address this issue inasmuch as the ALJ will necessarily re-evaluate Lindey's credibility in the course of reconsidering the medical evidence.

## IV. CONCLUSION

Based upon the foregoing reasons, Lindey's motion for summary judgment shall be denied and the Commissioner's motion for summary judgment shall be denied. The matter shall be remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion. An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROGER L. LINDEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-146 Erie |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

AND NOW, this 14th day of May, 2007, and for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 8] is DENIED and Defendant's Motion for Summary Judgment [Doc. No. 10] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is hereby directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.